THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID V. LUKES,                          )
                                         )
           Plaintiff,                    )
                                         )    Case No. 07 C 6250
                                         )
     v.                                  )    Magistrate Judge
                                         )    Arlander Keys
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of the Social               )
Security Administration,                 )
                                         )
           Defendant.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff, David V. Lukes, moves this Court for Summary
Judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security denying his claim for Disability
Insurance Benefits ("DIB"). 42 U.S.C. § 405(g) (2003).
Defendant, Michael J. Astrue, Commissioner of Social Security,
has filed a Cross-Motion for Summary Judgment, asking this Court
to affirm the Commissioner's final decision. For the reasons set
forth below, the Court denies Plaintiff's motion and grants
Defendant's motion to affirm the decision of the Commissioner.

## Procedural History

Plaintiff David V. Lukes filed for DIB on August 6, 2004,
with an alleged onset date of December 31, 1999, and a date last
insured ("DLI") of December 31, 2002. The initial decision

insured ("DLI") of December 31, 2002. The initial decision denying his claim of disability was issued November 24, 2004. Mr. Lukes filed a request for reconsideration on January 26, 2005, which ultimately was denied on February 17, 2005. Mr. Lukes then filed a motion for extension of time to request a hearing on July 20, 2005, and ultimately filed his request for a hearing on July 21, 2005. The hearing was held before Administrative Law Judge ("ALJ") Robert C. Asbille in Evanston, IL, on August 10, 2006. The ALJ issued his decision denying benefits on October 27, 2006. The Appeals Council denied a request for review on September 7, 2007, which rendered the ALJ's decision the Commissioner's final administrative determination. As a result, Mr. Lukes commenced this action seeking either remand or reversal of the ALJ's decision.

## Factual Background

### I. Social Security Administrative Hearing

Mr. Lukes appeared and testified at the hearing held on August 10, 2006. Charles Metcalf, M.D., an impartial medical expert ("ME"), and William Newman, an impartial vocational expert ("VE"), also testified. Mr. Lukes was represented by Clyde Ogg, an attorney.

At the outset of the hearing, the ALJ noted that, in addition to the alleged onset date of December 31, 1999, the claimant had a date last insured of December 31, 2002. As such,

the claimant must establish that he had become disabled prior to that date.

A.  *Testimony of David Lukes, Plaintiff*

Mr. Lukes began his testimony with an overview of his then-current status: sixty-one years of age, five foot eight, two hundred thirty pounds, with an educational level of having finished the second year of high school and is currently unemployed. R. at 634-35. He testified that he had not worked since December 31, 1999, but he worked prior to that in carpentry and plastering. R. at 636. He confirmed that both types of work included heavy lifting and constantly being on his feet. *Id.*

Mr. Lukes testified that he was receiving VA disability for diabetes, which he has had since the age of 38, which he claims was caused by Agent Orange during his army service in Vietnam. R. at 639-40. He further testified that he was a brittle diabetic, with blood sugars fluctuating wildly, including levels ranging anywhere from 60 to 400 within the span of "a couple hours." R. at 645. At the hearing, Mr. Lukes agreed that the medical records showed a 1999 glucose reading of 255, with hemoglobin at 11.2, and a 2000 average of "over 400." R. at 644-45. He testified that his blood sugar on the day of the hearing was 220, which was "typical for him." R. at 642. Additionally, he stated his hemoglobin A1C was at 8.3. *Id.*

3

Mr. Lukes testified that the difficulty in controlling his blood sugar also affected other physical aspects, such as increasing blurred vision and fatigue. R. at 645. He testified that he stopped working in 1999 because of trouble seeing, and that he stopped carpentry specifically because he could not read tape measures, blueprints and documents. R. at 663, 638. He stated that in 1999 he had a shadow in the center of his vision, but could see peripherally. R. at 644. Additionally, he testified that glasses could not correct his constantly blurred vision. R. at 642. Mr. Lukes also testified that these vision problems caused him to stop riding his bicycle in 2000. *Id.* He further testified that he was licensed to drive and was still doing so, except at night. R. at 635. However, he indicated that he was doubtful he would be able to pass the next vision test to maintain his license. *Id.*

Mr. Lukes claims that, prior to December 31, 2002, his diabetes was contributing to neuropathy in his hands and feet. R. at 636. When the ALJ questioned how he knew it was neuropathy, Mr. Lukes said that he had been to the doctor for tests because of numbness and tingling in his toes. R. at 637. He also stated that, if he stood in one place for a long time, he would get numbness in his legs, feet and toes, and eventually, the numbness would require sitting and raising his feet. *Id.* Despite the neuropathic symptoms, however, Mr. Lukes testified

that he had no problems operating the pedals or foot controls on his car, even at the date of the hearing. R. at 636. He said that he had had no problems walking in 2002, but he had had difficulty with climbing ladders and balancing on scaffolds. R. at 637.

Mr. Lukes also testified as to problems with dropping tools. R. at 638, 663. He first started noticing trouble holding things in 1999, which is also the year he quit work because of dropping things. R. at 639, 663. He stated that he could manipulate zippers fine, but buttons were difficult for him. R. at 638. Additionally, he stated that he could not do housework because of difficulty holding things. R. at 639. Mr. Lukes claimed further dexterity issues resulting from a continuous trigger thumb, which began in 1999. R. at 643. He said that the thumb would lock open or closed until he used his other hand to open it, but he worked through it as best he could. R. at 643-44.

In addition to the neuropathy, Mr. Lukes claimed diabetic complications causing heart trouble. R. at 636-37. He stated that the heart symptoms – shortness of breath and chest pain – began in 1999 (R. at 638-39), explaining that that part of his heart did not get enough blood because "the diabetes killed off those little blood vessels that feed the muscle of the heart." R. at 637.

Mr. Lukes also offered testimony relating to his back injury, which he claims he injured in Vietnam while carrying sandbags. R. at 640. During the hearing, he first stated that it "always bothered him," but a few moments later stated that it "periodically" bothered him. R. at 640-41. He stated that he continued to work, using Advil and other pain medications. He also claimed that he had a bulging disc and "something torn" between the L4 and L5 vertebrae, but had not had any surgery. R. at 641.

With regard to mobility, Mr. Lukes testified that, at the time of the hearing, he could not walk more than half a block without pain and lack of breath. *Id.* At date last insured, in 2002, he testified that he could walk three blocks. *Id.* While he stated that he had no trouble walking short distances at that time, he also stated that the more he walked or stood, the more his feet would swell. R. at 646. He also testified that, two to three times a week, his feet would swell to the point where he could not put on shoes. *Id.* He claimed the swelling would last a day or two, "then [he would] take the water pills" and it would go down. *Id.*

Mr. Lukes also testified as to problems with his left knee. He said that he had swelling and stiffness beginning in 2002. R. at 644, 656. Initially, he stated that he had a pre-operation exam in January of 2003. R. at 644. However, after the ME

6

opined that the January 2003 date appeared to be a clerical error and was in fact from January 2004, Mr. Lukes testified that the pre-op physical was for problems with a leaking bursa prior to the May 2003 patellar tendon tear. R. at 655-57. Mr. Lukes stated that cortisone shots for the swelling and pain of the bursa leak caused the tendon to weaken and ultimately tear. R. at 657. He first testified that the operation was to repair the patellar tendon, but then stated that the January 2004 operation was to remove the bursa and "then the tendon tore six weeks later." R. at 657-58.[1]

  B.  *Testimony of Dr. Charles Metcalf, Medical Expert*

  Dr. Metcalf, the ME, began his testimony with a summary of Mr. Lukes' knee condition, including the May 2003 injury and three surgeries in early 2004. R. at 649. He opined that Mr. Lukes had difficulty squatting, kneeling, standing, and walking as a result. *Id.* The ME testified that he believed the original January 2003 pre-op physical date to be a clerical error (R. at 654), with the actual pre-op physical being in January 2004 (R. at 75, 655). At the hearing, the ME testified that a January 2003 date would have indicated that Mr. Lukes had had problems

---

  [1]After the hearing, Mr. Lukes' attorney conceded that the January 2003 pre-op physical date was, in fact, a clerical error, and that the correct date was January 2004 for both the pre-op physical and the first knee operation. R. at 75.

7

with the knee before the DLI, but a January 2004 date would not. R. at 660.

With reference to Mr. Lukes' diabetes, the ME conceded that his control was not good, but neither was it bad. R. at 650. He testified that Mr. Lukes had had diabetes since 1981, and was insulin dependent since then. *Id.* He stated that the record showed Mr. Lukes had never been in ketoacidosis and that his hemoglobin had ranged from 7.6 to 8.9, and that the 11.2 number previously referenced by Mr. Lukes' attorney was in fact the result of a different testing method, done at the same time as an A1C test result that showed 8.9, and thus should not be included in hemoglobin A1C considerations. R. at 650-51.

The ME testified that Mr. Lukes' blood sugars ranged from the 100s to the 300s, with the notation of 400 being a phone message from Mr. Lukes, rather than an official record, and the reading of 600 from his ER record being an anomaly caused by acute stress tied to the chest pain. R. at 651, 659. He stated that the hemoglobin A1C is a better indicator of overall sugar control and that consistent 400s (or worse) would not allow for A1C results in the mid-eights. R. at 659. The ME admitted that highly elevated blood sugars would affect concentration, but Mr. Lukes' blood sugar was not to that level on an average day, as indicated by his hemoglobin A1Cs, which were generally in the eights. R. at 666.

8

The ME testified that Mr. Lukes did have retinopathy, but not severe enough for photocoagulation. R. at 650-51. Also, Mr. Lukes' vision problems were a result of diabetic abnormalities but, while progressive, were not enough to make him legally blind. R. at 650.

With regards to Mr. Lukes' neuropathy, the ME offered the opinion that Mr. Lukes had significant peripheral neuropathy in 2002, because while the first mention in the record was from April 2003, the implication was that he had been affected by it for longer than that. R. at 650, 652. When later shown the 1997 electromyogram (EMG) data and interpretation, the ME said that the raw data looked to him to be "mild" rather than "moderately severe," as the EMG interpreter had labeled it in the medical record. R. at 665. However, he also explained that peripheral neuropathy in diabetics is a sensory issue, causing numbness in hands and feet, rather than a motor issue, regardless of the severity level as evidenced by the EMG. R. at 650, 654, 665. He further stated that neither reflex abnormalities nor any motor strength diminution had appeared on any of Mr. Lukes' exams. R. at 666. As such, the ME stated that the neuropathy would not impair Mr. Lukes' ability to walk, with a normal gait, or to stand for six hours, but would cause issues with balance, climbing and some hand manipulation. R. at 652. Under questioning by Mr. Lukes' attorney, the ME said that the sensory

issues were not consistent with dropping things, but would only cause difficulty in picking them up. R. at 654. Later in his testimony, however, the ME stated that dropping tools would be consistent with sensory neuropathy in that the feeling in Mr. Lukes' hands was not normal, which would have an impact on fine manipulative activities. R. at 670. It would not, however, affect the ability to lift large boxes or heavy weights. *Id.*

The ME explained that, while Mr. Lukes did have coronary artery disease, he did not have enough blockage to warrant surgery. R. at 650. In summarizing multiple stress tests, echocardiograms, Myoview tests and angiograms, the ME concluded that, while there was a small abnormality in part of the muscle's ability to contract, testing showed no particular artery as the cause. *Id.* Overall, the plaintiff's recent heart tests were normal, showing good ejection fractions of 61 and 75 percent. R. at 640. With reference to the small-vessel disease to which Mr. Lukes testified, the ME said there was no, and could be no proof of it, as it is always a speculative diagnosis. *Id.*

The ME stated that, while Mr. Lukes did have a disc bulge, it showed no herniation or neuropathy causation, so it was a side issue. R. at 649.

The ME also found that the record indicated that Mr. Lukes had had leg ulcers in 2000, along with swelling of the feet and calves. R. at 664. He referenced reports from Dr. Goodman which

indicated that testing had eliminated multiple possible causes, but that an actual cause had not been found. R. at 667. The ME offered a tentative diagnosis of varicose veins, but stated unequivocally that diabetes was not the cause. *Id.* He also briefly addressed records of microalbuminuria as not being severe enough to constitute nephropathy, a potential diabetic cause of edema, and cellulitis of a left toe from July 2002. R. at 668-69.

As to overall mobility and motor capabilities, the ME opined that, prior to the DLI of December 2002, Mr. Lukes could still lift and hold as much as 50 pounds. R. at 653-54. According to the ME, Mr. Lukes would have been restricted only in the areas of balance, manipulation and climbing, as his cardiac condition and retinopathy were not interfering with overall physical abilities. R. at 653.

*C. Testimony of William Newman, Vocational Expert*

William Newman, the Vocational Expert ("VE"), established that Mr. Lukes' past work was that of a carpenter, which is defined by the DOT as skilled work with medium exertion. R. at 636, 670. Mr. Lukes also worked with drywall, which fell into the heavy exertion range. R. at 636.

During the hearing, the ALJ posed the following hypothetical worker to the VE: one of Mr. Lukes' age, education and work experience, restricted to lifting 50 pounds occasionally and 25

11

pounds frequently, limited to only occasional feeling or fingering, forbidden from using tools where dropping would create a hazard, forbidden from working on unprotected heights or with other hazardous machinery, with difficulty seeing large objects but not small ones. R. at 671-72. The VE stated that such a worker could not return to Mr. Lukes' past relevant work. R. at 672. However, he further stated that such a worker could perform the other medium level jobs of janitor and dining room attendant (with 83, 241 and 20,666 positions, respectively, in Chicago and its surrounding counties). Id.

Under questioning by Mr. Lukes' attorney, the VE confirmed that the positions required gross manipulation only. R. at 673. Further, he confirmed that central vision difficulties, if it affected seeing objects overall, would affect the jobs, but that neither job would require vision capable of seeing small objects. Id. The attorney added to the ALJ's hypothetical worker's limitations by saying he would require regular, unscheduled breaks of at least half an hour, which the VE confirmed would create difficulties in doing either of the two jobs. R. at 674-75.

## II. Medical History

In addition to the live testimony of Mr. Lukes and the two experts, the ALJ also considered the medical records on file.

12

*A. Records prior to alleged onset date of December 31, 1999*

An electromyogram (EMG) report from Northwest Community
Hospital dated April 3, 1991 (almost eight years prior to the
alleged onset date), offered the physician's impression of mild
to moderate right carpal tunnel syndrome, suspected very mild
left carpal tunnel syndrome and no evidence of ulnar neuropathy.
R. at 568. The report further explained that some findings which
could be consistent with bilateral C7 radiculopathies were
uncertain, as Mr. Lukes was asymptomatic for cervical
radiculopathy, he had no abnormalities of strength or reflexes in
C7 root distribution, and he had some denervation seen in the
paraspinal musculature in the thoracic and cervical areas. *Id.*
The note explained that the denervation could be part of a
diabetic amyotrophy syndrome, but was unrelated to the then-
current right hand symptoms. *Id.*

Mr. Lukes had a consultation with Dr. Dallas-Prunskis of Elk
Grove Pain Treatment Institute regarding his hip pain on October
31, 1996. R. at 570. Dr. Dallas Prunskis noted that motor
strength at the hip was slightly decreased. R. at 571. He also
noted that Mr. Lukes indicated the hip pain was primarily when he
would lie on his side or abducted the right hip, and it would go
away if he lay flat on his back, sat up, or walked around. R. at
570. Mr. Lukes only reported certain movements as affecting the
pain, such as climbing ladders with high steps. *Id.*

13

Mr. Lukes later had a consultation with Dr. Sanford Sherman of Northwest Neurology, Ltd., on February 13, 1997. R. at 572. Dr. Sanford indicated that Mr. Lukes' hip pain got worse when he walked for extended periods. *Id.* He also indicated normal motor control, no muscle atrophy, and symmetrical sensory reactions to pin prick, vibration, temperature and touch tests. R. at 573. His final impression was that Mr. Lukes was suffering from either lumbosacral radiculopathy, sciatic mononeuropathy, or plexopathy. *Id.*

On February 20, 1997, the records from Alexian Brothers Medical Center show that EMG:NCV studies were done on both lower limbs. R. at 569. The impression of the physician, Dr. Gene Neri, M.D., was that of "moderately severe peripheral polyneuropathy mainly demyelinating in type, consistent with the patient's known diagnosis of diabetes." *Id.* Dr. Sanford saw Mr. Lukes for a follow-up on April 11, 1997 and referenced the above EMG results. R. at 574. He indicated that the EMG testing was consistent with a neuropathy and an L5 radiculopathy on the right. *Id.*

Mr. Lukes also saw Dr. Richard Moser, with Surgical Neurology Associates, Ltd., on August 14, 1997. R. at 575-76. Dr. Moser noted that Plaintiff had a normal mental status, good strength through the extremities in response to a motor examination, and a normal response to a sensory examination. R.

14

at 575. He attributed Mr. Lukes' back pain to the degenerative disk disease at the L5-S1 level alone. *Id.* He did not recommend surgery at that time. R. at 576.

Records from Dr. Cirrincione, with Barrington Orthopedic Specialists, dated July 26, 1999, showed that Mr. Lukes came in with complaints of right thumb pain, locking and triggering. R. at 137. While the thumb was tender, he retained active range of motion and the rest of the exam was normal. *Id.* Dr. Cirrincione diagnosed right thumb flexor tenosynovitis and prescribed an anti-inflammatory. *Id.* Mr. Lukes returned in August and September for cortisone injections, but then failed to appear for his October appointment; the record does not show any further visits for his thumb after that date. R. at 138-39.

Further records from Barrington Orthopedic Specialists showed that, on September 20, 1996, Mr. Lukes suffered from right hip bursitis. R. at 124. The records showed that he suffered from pain "radiating from the lateral hip area to the right groin" but indicated that both motor and sensory abilities were grossly intact. *Id.* Dr. Cirrincione also indicated that Mr. Lukes was being treated by a Dr. Flaster for epididymitis. *Id.*

January 19, 1999, records from Dr. Gregory Nelson, of Suburban Associates in Ophthalmology, showed that Mr. Lukes came in complaining of a shadow in the center of his vision. R. at

15

164. The diagnosis listed presbyopia, which is far-sighted vision caused by age. *Id.*

July 29, 1999, records from Alexian Brothers Medical Center show that Mr. Lukes received medical nutrition therapy. R. at 179-80. The records also show that he had a glucose level of 224, a hemoglobin level of 11.2 and a hemoglobin A1C level of 8.7, while also noting that his urine glucose was at a panic level. R. at 181-83.

An Alexian Brothers echocardiogram from December 15, 1999, showed some chest heaviness, but no sustained chest pains. R. at 184. The examining physician noted a normal stress electrocardiogram with normal blood pressure (178/80) in response to exercise, a peak heart rate of 163, and an achievement of 10 Mets of workload. *Id.* He also noted possible exertional asthma and a "fair" exercise tolerance for Mr. Lukes' age. R. at 184-85.

*B. Records between December 31, 1999, and December 31, 2002*

Treatment records from Dr. Goodman, Mr. Lukes' general practitioner, show a notation on January 5, 2000, to call Mr. Lukes and inform him that he had poor control over his diabetes and his readings would not improve without better diet and eating schedule. R. at 187. On January 12, 2000, the doctor noted that Mr. Lukes' diabetes was "out of control." *Id.* Also on January 12, 2000, Alexian Brothers Medical Center x-rays showed that Mr.

Lukes' chest, heart and paranasal sinuses were normal, with no asthma or sinusitis. R. at 203-04.

Mr. Lukes had a routine check-up with Dr. Goodman on July 20, 2000, where he reported generally feeling well, except for a strained knee, which he was self-treating with ibuprofen. R. at 189. At the same time, the doctor noted that his sugars were "totally labile and unpredictable" ranging from 100-300s. *Id.* At that date, the doctor noted sugars at 363 and hemoglobin A1C of 9.2. *Id.*

Mr. Lukes left Dr. Goodman a phone message on October 19, 2000, reporting blood sugar averaging 400 and over for a week. R. at 190. Notes from his visit the next day show that Mr. Lukes had a flare-up of epididymitis and that the doctor had a "*long* discussion" regarding his diabetes care. *Id.* (emphasis in original). One month later, on November 20, 2000, he visited again with cellulitis in the left leg, along with edema (swelling) of two-to-three times normal. R. at 191. A prescribed antibiotic and cream treatment resolved the problem within a week. *Id.*

Emergency room (ER) records show that Mr. Lukes came in on December 10, 2000 with a superficial skin laceration from hitting his finger with his hammer. R. at 207. His x-rays showed no fracture and the ER released him after treating the wound with a steri-strip. *Id.* He denied any tingling or numbness. *Id.* In

17

addition, records from Dr. Goodman show a notation on April 12, 2001, of a visit by Mr. Lukes to the ER with chest pain on April 7, 2001.[2] R. at 193. The notation indicates that Mr. Lukes had a blood sugar of 600 at that time, but that a later stress echocardiogram on April 16, 2001, was normal. R. at 193, 211-13. Alexian Brothers records of the echocardiogram indicate that it showed no chest pain, albeit a below-average work capacity. R. at 211-12.

On April 10, 2001, notations from a visit to Dr. Gregory Nelson, of Suburban Associates in Ophthalmology, showed a diagnosis of BDR (background diabetic retinopathy) and mild cataracts. R. at 165. The records indicate that Mr. Lukes reported light sensitivity and trouble with vision when driving at night. Id. Then, about six months later, the plaintiff visited Dr. Goodman with feet and ankles again swollen two-to-three times normal size. R. at 195. Dr. Goodman prescribed a diuretic (Lasix). Dr. Goodman's notes on October 18 also show that Mr. Lukes' protein readings were normal. R. at 196-97.

Alexian Brothers records show a November 1, 2001, CT scan of the abdomen and pelvis, which was unremarkable except for a herniation of a small amount of fat as a result of a ventral hernia repair. R. at 214-16.

_____

[2]While Dr. Goodman's records reference the ER visit, the actual record of the visit is not contained in the administrative record.

A January 29, 2002, phone message with Dr. Goodman shows that Mr. Lukes complained of epididymitis again and requested a refill of his prior prescription. R. at 197.

On April 4, 2002, Mr. Lukes visited the ER again due to a laceration to his left palm and wrist. R. at 220-25. He reported slipping and cutting himself while trimming a wood door. R. at 221. The treating physician noted minimal bleeding, full range of motion and sensation; she stitched the wound and released him. Id.

On April 18, 2002, Mr. Lukes complained to Dr. Goodman of irregular heart rate and chest discomfort. R. at 198. He also attributed isolated palpitations to his use of Lasix for leg swelling. Id.

Records from a May 9, 2002, visit to Dr. Nelson show that Mr. Lukes complained of blurry vision, which was worse in the morning and late at night, with a continuing diagnosis of mild BDR and mild cataracts. R. at 166. On June 7, 2002, Dr. Vygantas, of Retina Consultants, noted in a letter to Dr. Nelson that Mr. Lukes had non-proliferative diabetic retinopathy with mild clinically significant macular edema (greater in the left eye than the right). R. at 540-41. He compared Mr Lukes' status to that of the 1997 records and said that there was a slight increase in microaneurysmal lesion, but that neither eye had proliferative diabetic retinopathy to warrant laser

19

photocoagulation. R. at 540. He also noted that "vigorous control" of his diabetes would deter further retinal changes. R. at 541.

In August 2002, Mr. Lukes complained to Dr. Goodman of lower back pain and requested a muscle relaxant and pain medication, which the doctor prescribed. *Id*. Records from November 2002 show that Mr. Lukes continued to complain of back pain, worse at night, and the doctor noted a large hernia in the lower left quadrant of his abdomen. R. at 199. However, he also noted no overall change in Mr. Lukes' back condition since a 1997 MRI showing a disc bulge, arthritis of the lumbar spine, and no herniated discs. *Id*. At the same time, Mr. Lukes had an excellent sugar reading of 110, with a less positive hemoglobin A1C reading of 8.7. *Id*.

C. *Records post-DLI of December 31, 2002*

Dr. Goodman's records from June and July of 2003 show complaints of left knee swelling and a diagnosis of pre-patellar bursitis. R. at 200-01.

In addition to knee problems, records from a June 13, 2003 visit to Dr. Nelson show that Mr. Lukes was still experiencing blurry vision, with headaches. R. at 167. On July 24, 2003, Dr. Nelson noted Mr. Lukes' vision as 20/50 in the Right eye and 20/60 in the left. R. at 174. Additionally, notations from a blood glucose monitoring class at the Hines VA hospital show

that, on November 12, 2003, Mr. Lukes had occasional blurry vision, but he nonetheless did well in the class and the records list "none" for limitations on reading. R. at 250. Further notations from January 22, 2004, show that, while he wore glasses, he had "no barriers to learning," no reading limits, and his preferred learning methods were verbal, print, and demonstrations. R. at 296. Additionally, on December 19, 2003, Dr. Vygantas noted that Mr. Lukes' non-proliferative diabetic retinopathy was still not severe enough to warrant laser photocoagulation, and that vigorous control of his diabetes would be a "more effective" deterrent to any retinopathic progression. R. at 175-76.

Records from Dr. Brian Donahue cover the treatment of Mr. Lukes' left knee from December 30, 2003 through July 8, 2004. R. at 226-40. The initial notation from December 2003 states that Mr. Luke had swelling of the left pre-patellar bursa since June, it had been aspirated three times, and it was injected with Cortisone twice. R. at 229. The doctor also noted that Mr. Lukes only had pain when he kneeled on it. *Id.* The rest of the notes covered the treatments and follow-ups for an arthroscopic bursectomy on January 30, 2004 and a patellar tendon repair for a rupture on March 26, 2004. R. at 227-40. A note on June 24, 2004, mentioned "years of chronic patellar tendonitis" and multiple cortisone injections prior to the January surgery. R.

21

at 238. However, the initial notes prior to the first surgery mention only the cortisone injections and aspirations after June 2003. R. at 229.

Following Mr. Lukes treatment of his left knee, he reported to Hines VA Hospital a history of tingling and numbness in bilateral lower extremities for "20-25 years," which affected his handwriting, holding a fork, etc. (R. at 259-60), despite an earlier notation from December 11, 2003 where he denied any numbness, weakness, or tingling of extremities. R. at 307. Additionally, while the records from May 2005 show that he had sensory effects in "reduced pin" bilaterally up to his knees and mid forearms, he also had no motor weakness or atrophy. R. at 260. Other notations from that same month show a diagnosis of peripheral neuropathy from diabetes; numbness, tingling, and burning in both feet; some sensory decrease; but motor capabilities and gait within normal limits. R. at 261, 268.

## III. Decision of the ALJ

In an opinion dated October 27, 2006, the ALJ found that Mr. Lukes was not disabled prior to his DLI. R. at 25. The ALJ followed the five sequential steps for determining disability as established by the Social Security Administration in 20 C.R.F. 404.1520(a). R. at 20-24. First, the ALJ established that Mr. Lukes was last eligible to receive DIB on December 31, 2002. R. at 20. Then, at step one, he determined that Mr. Lukes did not

22

engage in substantial gainful activity between his alleged onset date of December 31, 1999 through his DLI of December 31, 2002. *Id.* At step two, he concluded that Mr. Lukes had the following severe impairments: "left knee pre-patellar bursitis; diabetes mellitus, treated with Insulin and Glucophage, with diabetic retinopathy; status post superficial laceration to the left third finger, in December 2000; and status post ventral hernia repair, with a small amount of residual herniation at the repair site." *Id.* Then, at step three, the ALJ determined that none of the impairments individually, nor any of the impairments in combination, met the severity listings as established by 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 20-21.

Although the ALJ did not find Mr. Lukes' right thumb flexor tenosynovitis to be a severe impairment, he nonetheless analyzed it under step three and determined that it did not constitute a joint dysfunction, as required by Listing Section 1.02. R. at 21. He went on to determine, based on the medical records and on the opinion of the ME at the hearing, that there was no impairment or combination of impairments that would meet the requirements of Listing Section 9.08, which requires further complications for diabetes mellitus to constitute a disability. *Id.* With language parallel to that of the listing, he acknowledged that there was no record of any of the three complications required by the listing: neuropathy, acidosis, or

retinitis proliferans. *Id.* He recognized that Mr. Lukes' non-
proliferative retinopathy,[3] while not satisfying the listing, did
restrict his ability to see small objects. *Id.*

After step three, but prior to step four, the ALJ
established the following residual functional capacity (RFC) for
Mr. Lukes: "[he] could lift 50 pounds, occasionally, and 25
pounds, frequently; [he] could perform occasional feeling and
fingering of objects, with no restriction on handling; [he] did
not have the ability to use hand or power tools on a consistent
basis; and [he] did not have the ability to see small objects,
but could see larger ones." *Id.* In support of this RFC
classification, the ALJ stated that, while the medical records
showed that Mr. Lukes had swelling of the left pre-patellar bursa
during 2000 and through December 30, 2003, he only had pain when
kneeling on it. R. at 22. Thus, "even a year after [his DLI],
he continued to be able to use the left knee." *Id.* He also
referenced the clerical error of the date regarding Mr. Lukes'
first knee surgery, which was eventually established as 2004,
indicating that all the knee issues of listing level were
markedly after the DLI. *Id.* The ALJ further referenced the
opinion of the testifying ME in support of the limits on Mr.

---

[3]In his decision, the ALJ referred to "rhinitis," which is
irritation and inflammation of the nose, but context would
indicate that he was actually referring to "retinitis" of
"retinitis proliferans," which is the term used in Listing 9.08
and is synonymous with "proliferative retinopathy."

24

Lukes' vision and fingering, as well as the lack of limitation on ambulation. *Id.* He acknowledged Mr. Lukes' mild peripheral neuropathy, but relied on the ME's testimony that Mr. Lukes could stand and walk normally. *Id.* With regards to Mr. Lukes' credibility, the ALJ found his testimony to be reasonably believable, barring some confusion about date sequences, mostly with regard to the left knee but also with allegations of ambulation limitations – as most of the alleged limitations were in fact after the DLI. *Id.*

At step four, the ALJ applied the RFC to Mr. Lukes' past relevant work and determined that Mr. Lukes was not able to perform his past relevant work. R. at 23. In large part, he based this determination on the testimony of the VE, who stated as much based on the RFC given to him by the ALJ, as listed above. *Id.* And finally, at step five, again based on the testimony of the VE, the ALJ determined that there were other jobs which, considering Mr. Lukes' age, education, work experience, and RFC, existed in significant numbers that Mr. Lukes could have undertaken. R. at 24. The two particular job classifications offered by the VE were janitor and dining room attendant, available in the Chicago metropolitan area in the numbers of 83,241 and 20,666, respectively. *Id.*

Thus, the ALJ found Mr. Lukes not to be under a disability for the pertinent period and denied DIB accordingly. R. at 24-25.

## Standard of review

Because the Appeals Council found no basis for further review, the ALJ's findings constitute the final decision of the Secretary. 20 C.F.R. § 404.981; *Jones v. Shalala,* 10 F.3d 522, 523 (7th Cir.1993). However, the federal district court has the power to review that decision and may remand if it is not supported by substantial evidence or contains legal errors. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). The substantial evidence standard is a deferential one and requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 833, 841 (7th Cir. 2007) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). While the Court may review the entire record along with the ALJ's decision, it must not re-decide the facts, reweigh evidence or substitute its own judgment for that of the Secretary. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994); *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

Administrative review restricts analysis to the reasons supplied by the ALJ for his decision. *Steele v. Barnhart,* 290 F.3d at 941. As such, while an ALJ need not address every piece

of evidence in the record, he must articulate "an accurate and logical bridge between the evidence and the result." *Id.; see also Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006) (citations omitted). However, if the ALJ's decision is adequately supported, even if reasonable minds could differ concerning the final outcome, the Court must affirm. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008).

### Social Security Regulations

In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. 20 C.F.R. § 404.1520. First, the ALJ must determine if the claimant is currently employed; second, the ALJ determines what, if any, severe impairments the claimant has; third, the ALJ must determine if any of the impairments meet or equal the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; post-step three, the ALJ must determine the claimant's residual functional capacity (RFC), for use in steps four and five; fourth, the ALJ must use the RFC to determine if the claimant can still do his past relevant work; and fifth, using the RFC in combination with the claimant's age, education, and work experience, the ALJ must determine whether the claimant can perform other work available in the national economy. 20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden

of proof; at step five, the burden shifts to the Commissioner.
*Id.*

## Discussion

Mr. Lukes argues that the ALJ's decision must be either
reversed or remanded for the following reasons:

(1) at step two, the ALJ lists no severe impairment which
would result in the RFC limitation on fingering, does not
include neuropathy as a severe impairment despite
acknowledging it in the RFC analysis, and does list a severe
impairment of left knee pre-patellar bursitis that is not
reflected by any RFC limitations on standing or walking;
(2) at step three, the ALJ indicates no record of neuropathy
(despite a record "replete with evidence of neuropathy" and
acknowledgment of it in RFC analysis) and thus improperly
ruled Mr. Lukes' diabetes mellitus to be of non-listing
level severity;

(3) in the RFC analysis, the ALJ's RFC limitation on use of
hand or power tools contradicts the finding that Mr. Lukes
could perform occasional feeling and fingering;

(4) in deciding the RFC, the ALJ failed to consider Mr.
Lukes' vision limitations;

(5) the ALJ erred in his credibility assessment of Mr.
Lukes' testimony regarding ambulation;

28

(6) the ALJ's step five findings were erroneous because the hypothetical as posed to the VE was incomplete (lacking limitations on standing and walking, as well as reference to thumb triggering) and the VE testified that a claimant requiring excessive breaks could not perform the suggested jobs;

(7) the ALJ failed to make a function by function assessment of his RFC pursuant to SSR 96-8p; and

(8) the VE's testimony conflicts with the janitor job description in the *DOT* and Grid Rule 202.02 supports a finding of disabled.

### (1) Step Two Challenges

Mr. Lukes' challenges to the ALJ's determinations at step two rest partly on the definition of a "severe impairment." To qualify as a severe impairment, it must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities include, among others, those of lifting, pushing, pulling, carrying, and handling. 20 C.F.R. § 404.1521(b). The threshold to constitute severity is low, only barring those that are slight enough not to "interfere with *anyone's* basic work activities," with the larger emphasis being on step three (listing) and step four (ability to do relevant past work) analysis regarding the

specific claimant. *McCullough v. Heckler*, 583 F.Supp. 934, 939 (D.C.Ill. 1984).

Under this definition, the sensory difficulties associated with diabetic peripheral neuropathy could qualify as severe if they resulted in limitations on lifting, pushing, pulling, carrying or handling. There is ample evidence in the record that Mr. Lukes suffered from peripheral neuropathy during the pertinent time period and that its symptoms created difficulties in certain dexterous functions, such as holding on to tools and manipulating small objects such as buttons. For example, Mr. Lukes testified directly to dropping tools and trouble buttoning buttons. R. at 638-39. The ME testified that Mr. Lukes would have no difficulty walking, and that there was no record of any motor impairments from the peripheral neuropathy, but that it would cause difficulty picking up objects and with fine manipulative activities. R. at 652, 654, 670. Further, while the medical records during the pertinent years do not offer much evidence of neuropathy, an EMG from 1997 (pre-onset) shows a diagnosis of neuropathy (R. at 569) and notations from 2003 Hines VA hospital records (post-DLI) imply that Mr. Lukes had had symptoms of it for years. R. at 259-60.[4] Therefore, based on

---

[4]Mr. Lukes also challenges the ALJ's reliance on the ME's analysis of the peripheral neuropathy, as the 1997 EMG specifically lists polyneuropathy and the ME, though stating that peripheral neuropathy is a sensory issue, admitted to not knowing what polyneuropathy means. However, poly- is simply a prefix

30

the definition of "severe impairment" and the substantial
evidence in the record, the ALJ erred in not listing peripheral
neuropathy as a severe impairment at step two.

Alternately, Mr. Lukes' pre-patellar bursitis, though
qualifying as severe because of its original interference with
kneeling and then later interference with walking and standing,
was not in fact severe during the relevant time period between
alleged onset and date last insured. The first indication on the
record of pre-patellar bursitis was not until mid-2003. R. at
189, 229. While one later entry states that Mr. Lukes had
suffered from "years of chronic patellar tendonitis," there is no
record of such prior to that June 2004 notation. R. at 238. At
the hearing, there was some confusion during testimony as to
whether Mr. Lukes had first had a pre-operation physical in
January 2003 (indicating problems prior to the December 31, 2002
DLI) or January 2004 (R. at 655-57), but Mr. Lukes later conceded
that the medical record date of January 2003 was a clerical error
and that the correct date was 2004. R. at 75. Therefore, the
ALJ erred in listing pre-patellar bursitis as a severe impairment
at step two.

---

indicating "many" and polyneuropathy thus only means neuropathy
involving more than one nerve. As such, the diagnosis of
polyneuropathy – which was more technically "peripheral
polyneuropathy" – is consistent with the ME's affirmation that
diabetic peripheral neuropathy primarily manifests as a sensory
issue.

However, both of these errors fall into the category of
harmless errors.  The doctrine of harmless error is fully
applicable to judicial review of administrative decisions.  *Keys
v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) (Where ALJ's
application of old regulations brought about same result as would
the new regulations, the error was harmless and remand
unnecessary.)  If no reasonable trier of fact could have come to
a different conclusion, or, in other words, if the error did not
ultimately impact the outcome of the decision, the error is
harmless and the Court may affirm.  *Shramek v. Apfel*, 226 F.3d
809, 814 (7th Cir. 2000) (citing *Sarchet v. Chater*, 78 F.3d 305,
309 (7th Cir. 1996)).  By contrast, an error that is a factor in
an ALJ's finding of no disability cannot be harmless.  *Tom v.
Heckler*, 779 F.2d 1250, 1256 n.9 (7th Cir. 1985).

     With regard to the first challenge, the lack of peripheral
neuropathy (or another severe impairment) to correspond with the
limitations on fingering in the RFC, the issue is whether the
lack of inclusion in the severe impairment category "short-
circuited" the disability determination process.  *Jackson v.
Heckler*, 592 F. Supp 1124, 1126-27 (D.C.Ill. 1984).  In *Jackson*,
the ALJ confused step two severity as requiring listing-level
severity (step three) and as a result found no severe impairments
at all in step two.  *Id.* at 1125.  Nonetheless, he continued on
to analyze whether the plaintiff could perform her past relevant

work, which is the same thing he would have done had he listed those impairments as severe. *Id.* at 1126-27.

At step two, The ALJ did not include peripheral neuropathy, or any other severe impairment that would have any effect on dexterity, except for a "status post superficial laceration of the third finger" that, as a surface level cut not even requiring stitches, would have no long term effect on Mr. Lukes' RFC abilities. However, the RFC that the ALJ listed in his decision, and verbally posed to the VE at the hearing, did reflect the physical limitations caused by the peripheral neuropathy. As such, the analysis at step four of whether Mr. Lukes could do his past relevant work and, if not, the analysis at step five of whether there was other work available for him to do, adequately reflected his medical status. Therefore, the failure to include peripheral neuropathy as a severe impairment at step two did not "short-circuit" the disability determination process and was a harmless error.

Similarly, the error in including left knee pre-patellar bursitis as a severe impairment was ultimately harmless. The inclusion of a severe impairment that does not in fact exist could be an error requiring reversal if it were vital in creating a determination of "disabled." However, in this case, the ALJ also recognized that the problems from the pre-patellar bursitis did not meet or equal the requirements of Listing Section 1.00,

33

concerning the musculoskeletal system, even eight months after the DLI. R. at 20-21. The lack of listing level severity supported the ALJ's determination of "not disabled," so clearly the removal of the severe impairment at all would only further support such a determination. Therefore, the error had no impact on the outcome of the decision and thus the inclusion of pre-patellar bursitis as a severe impairment was a harmless error.

Furthermore, even if one could retroactively infer from the January 2004 surgery necessitated by pre-patellar bursitis that it had existed as far back as December 31, 2002, and thus its inclusion as a severe impairment was accurate, Mr. Lukes' challenge to the ALJ's decision would still fail. Mr. Lukes argues that the RFC offered no limitations on standing or walking, and thus, did not accurately correspond to the severe impairment findings. However, the record shows that even a full year after the DLI, Mr. Lukes only had pain when he kneeled. R. at 229. As such, there were no limitations on standing or walking, caused by pre-patellar bursitis, to be included in the RFC.

**(2) Step Three Challenges**

Mr. Lukes argues that the ALJ erred at step three by ruling that his diabetes mellitus (diabetes) was not at listing level and, in that analysis, stating that there was no record of neuropathy, despite a record "replete with evidence of

34

neuropathy." However, this argument shows a limited reading of the ALJ's decision.

As explained above, the ALJ did err in not listing peripheral neuropathy as a severe impairment. He did, however, base his RFC analysis on both the evidence in the record and the ME's opinion that Mr. Lukes' peripheral neuropathy was a sensory impairment that affected feeling and fingering, which rendered the error harmless.

At step three, when the ALJ stated there was no record of neuropathy, he was not looking at neuropathy alone, but as a factor in combination with diabetes to determine whether the diabetes was of listing level. R. at 20-21. Specifically, in saying that Mr. Lukes did not have a combination of impairments to meet the requirements of Section 9.08, which details the listing analysis for diabetes, he said there was "no record of neuropathy, acidosis, or retinitis proliferans." R. at 20-21. The language given in Listing Section 9.08 states that diabetes must be combined with:

> A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
> B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $PCO_2$ or bicarbonate levels); or
> C. Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing 9.08).

The direct parallel between the three complications listed in Section 9.08 and the ALJ's language indicates that the ALJ meant that there was no record of neuropathy *of the type given in the listing*. The listing requires neuropathy demonstrated by "significant and persistent disorganization of motor function." *Id*. While the record, as Mr. Lukes argues, is "replete" with evidence of neuropathy, all such evidence is only of a peripheral neuropathy, which manifests as a sensory issue and, in Mr. Lukes' case, only limited fine dexterity. In fact, multiple places in the record specifically state no impairment of motor function or gait, including records from Hines VA hospital regarding Mr. Lukes' health after the DLI. R. at 260-61, 268.

Additionally, at step three of the determination process, the claimant is the one who bears the burden of showing that he satisfies all the elements of a listing. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004); *See* 20 C.F.R. § 404.1512(c). Mr. Lukes, however, only points to records from before the relevant time period that mention neuropathy and claims it is enough to satisfy the listing. Nowhere does he specify any evidence in the record to satisfy the specific 9.08(A) requirements of significant disorganization of motor function, with disturbance of gross *and* dexterous movements or gait and station.

36

Mr. Lukes is correct in arguing that the ALJ cannot ignore
an entire line of evidence contrary to his ruling and that he
must articulate "an accurate and logical bridge between the
evidence and the result." *Golembiewski v. Barnhart*, 322 F.3d 912,
917 (7th Cir. 2003); *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th
Cir. 2006) (citations omitted). However, neither argument
undermines the ALJ's decision here. First, while the ALJ erred
(as discussed above) in not listing peripheral neuropathy as a
severe impairment, he did not ignore that line of evidence
completely, but rather included it in his RFC analysis exactly as
he would have done had it been listed as a severe impairment.

Second, though inclusion of peripheral neuropathy would have
resulted in an analysis of whether it alone met a listing level,
the analysis of whether Mr. Lukes' diabetes was of listing level
would have remained the same as there was, in fact, no record of
neuropathy sufficient to allow his diabetes to meet listing
requirements. Further, the bridge between the evidence and the
result is apparent when looking at the decision as a whole. In
his post-step three discussion, the ALJ made it clear that he
relied on the ME as well as the medical records in coming to his
determination of the extent that Mr. Lukes' neuropathy impacted
his RFC. R. at 22. The language parallel to the listing,
combined with the further analysis of the peripheral neuropathy
and its impact on RFC, show that the ALJ neither ignored the

evidence of neuropathy, nor erred in his determination that Mr.
Lukes' diabetes was not of listing level.

**(3)  RFC - Contradiction between Dexterity Limitations**

Mr. Lukes argues that the ALJ's RFC finding is not supported
by substantial evidence in that it limits use of hand and power
tools while allowing handling and occasional feeling and
fingering.  He contends that the medium exertional finding, with
occasional feeling and fingering and no limitation on handling,
is not accurate because the restriction on hand and power tools,
which he claims would require grasping, holding, and turning,
would indicate "gross manipulation is more severely affected."
(Pl.'s Br. 12.)

Social Security Ruling 83-10 defines occasional as
"occurring from very little up to one-third of the time."  It
further defines the dexterity parameters of medium exertional
work as requiring "[u]se of the arms and hands . . . to grasp,
hold, and turn objects, as opposed to the finer activities in
much sedentary work, which require precision use of the fingers
as well as use of the hands and arms." SSR 83-10.

The ALJ had substantial evidence to support the RFC finding,
particularly in the testimony of the ME stating that Mr. Lukes
had neuropathic numbness and tingling affecting sensation and
manipulation without affecting motor strength.  R. at 652-64,
670.  He further had evidence from Mr. Lukes' own testimony of

dropping and having difficulty holding onto power tools.  R. at 636-39.

Contrary to Mr. Lukes' argument, the restriction on the use of hand and power tools does not indicate severely affected gross manipulation.  Rather, both hand and power tools require precision of control.  For example, a janitor (one of the occupations possible under the ALJ's RFC finding) mopping a floor can be off by several inches without consequence.  In contrast, a contractor trimming a door with a hand-held power circular saw must maneuver it steadily within a fraction of an inch - the slightest slip either way will result either in a door that sticks or one that allows a draft.  A nail gun requires precise control to hold it in place in the face of its recoil.  Even manual hammering requires precise fingering to hold the nail in place and bring the hammer down on it accurately.  As hand and power tools would require much more than occasional fingering and feeling, the RFC finding is both supported by substantial evidence and is not contradictory.

**(4)  RFC - Vision Limitations**

Mr. Lukes challenges the ALJ's determination of RFC vision limits, claiming that the ALJ did not consider his diabetic vision problems, especially with regard to alleged difficulties with central vision and blurriness.  This argument fails,

however, as the ALJ clearly considered both hearing testimony and the medical records in forming this determination.

Specifically, the ALJ found an RFC of the ability to see large objects but not small ones. R. at 21. Mr. Lukes' testimony supports this determination in that he testified as to having trouble reading tape measures and blueprints, having blurred vision, and having a shadow in the center of his vision. R. at 638, 642, 644. Mr. Lukes' own testimony also included the fact that, though he was worried about passing his next vision test, he was still driving at the time of the hearing in 2006. R. at 635. Further, ophthalmology records show that he complained of a shadow in the center of his vision only once, in 1999, and that he had a consistent diagnosis of blurriness, mild cataracts, and background diabetic retinopathy of non-proliferative type, with the latter not severe enough to warrant photocoagulation. R. at 164-67, 540-41. Additionally, post-DLI records from the Hines VA hospital indicate that his only limitations on reading, a central vision activity that does involve small objects, was some blurry vision. R. at 250.

At step three, the ALJ specifically references Mr. Lukes' non-proliferative retinopathy, which, while not sufficient to satisfy the diabetic listing requirements, would restrict his ability to see small objects. R. at 21. In discussing the RFC, the ALJ explicitly relies on the ME's interpretation of the

40

medical records showing that "the claimant's diabetes had not resulted in significant retinal damage." R. at 22.

Additionally, as the Commissioner notes earlier in his brief, Mr. Lukes was represented by counsel at the hearing. (Def.'s Br. 11). When a claimant is represented by an attorney, the court may assume that the claimant has presented his strongest case for benefits. *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987). The ALJ did specify the RFC vision limitations verbally at the hearing, with both Mr. Lukes and his attorney present, and neither one objected to the extent of the limitation at that time. R. at 671-72.

Therefore, it is clear that the ALJ did consider Mr. Lukes' vision problems, specifically those related to his diabetes, and that he did adequately explain the effect of such in his decision.

**(5) Credibility Determination regarding Ambulation**

Mr. Lukes challenges the ALJ's determination of his credibility regarding his testimony regarding his ambulation difficulties, and thus the final RFC's lack of limitation on ambulation. He cites Social Security Ruling 96-7P, which addresses the ALJ's process for analyzing the claimant's testimony on "symptoms," further clarified as "an individual's own description of his . . . impairments." SSR 96-7P. While symptoms, such as pain and fatigue, are typically immeasurable

41

objectively, their effects can often be observed clinically. *Id*. As such, the ALJ must first determine if there is an underlying medically determinable impairment that could produce the claimant's pain or other symptoms, and then to evaluate the intensity, persistence and limiting effects of those symptoms to determine the resulting effect on daily work activities. *Id*.

Mr. Lukes rests his challenge on the ALJ's lack of reference to the February 1997 EMG showing neuropathy in both lower limbs, as well as lack of reference to Dr. Goodman's records. (Pl.'s Br. 13-14.) However, Mr. Lukes offers no specificity as to what in Dr. Goodman's records supports the claim of ambulation difficulties.

The 1997 EMG was from almost three years prior to Mr. Lukes' alleged onset date and, while establishing peripheral polyneuropathy of both lower extremities, it offered no record of any motor or ambulation difficulties as a result. R. at 569. Further, while the ALJ does not reference the EMG report by name, he does reference the records from Alexian Brothers Medical Center and the ME's opinion, based in part on those records, that Mr. Lukes did in fact have peripheral neuropathy and that it did not prevent him from standing and walking normally. R. at 22. In addition, the plaintiff's own testimony showed that any sensory impairment from the peripheral neuropathy was not severe enough to cause motor difficulties with his hands or feet that

would prevent him from driving, even after his DLI. R. at 635-36.

The ALJ did not reference Dr. Goodman's records in this analysis. R. at 22. However, an inspection of those records shows no information that could be used to support Mr. Lukes' contention of ambulation difficulties. Rather, the records show the following: two instances of foot and calf swelling, quickly remedied with antibiotic creams and diuretics (R. at 191, 195); two references to back pain, treated conservatively with muscle relaxants and pain medication (R. at 198-99); reference to a pre-onset 1997 MRI and the notation of no overall change in back condition from that time, when Mr. Lukes was still working (R. at 199); and reference to knee problems caused by pre-patellar bursitis beginning in June 2003, post-DLI (R. at 200-01).

The ALJ specifically stated that Mr. Lukes testified in a reasonably believable fashion, except that he seemed confused about dates regarding the knee problems. R. at 22. This confusion is clearly documented in the record of Mr. Lukes' testimony, offering conflicting dates and order of events regarding different aspects of the knee injuries and surgeries (R. at 644, 655-68), as well as Mr. Lukes' concession, after the hearing, that the pre-operation physical 2003 date was a clerical error (R. at 75). Further, the ALJ clearly considered the medical records regarding the limitations caused by the pre-

43

patellar bursitis. R. at 22. He accurately decided that the difficulties interfering with ambulation did not occur until after the 2004 surgeries, and thus, did not affect Mr. Lukes' physical capabilities prior to his DLI. R. at 22.[5]

For these reasons, the ALJ's credibility assessment of Mr. Lukes' testimony fulfilled the requirements of SSR 96-7P, and his refusal to offer ambulation limitations prior to the DLI is supported by substantial evidence.

## (6) Step Five Challenges regarding VE Hypothetical

Mr. Lukes contends that the hypothetical posed to the VE at step five was incomplete because it did not include any limitations on standing, walking, nor did it reference Mr. Lukes' right thumb triggering and any limitations resulting from it. He further challenges the ALJ's acceptance of the jobs suggested by the VE, as the VE testified that a person requiring excessive breaks could not perform them.

Hypothetical questions posed to vocational experts must include all limitations supported by medical evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). A vocational expert's testimony based on a complete hypothetical

---

[5]Mr. Lukes also testified as to difficulties with ladders and scaffolding during the pertinent period. R. at 637. However, as the alternate jobs put forth by the VE in step five, janitor and dining room attendant, have no need to use ladders or scaffolding, the lack of limitations on such, if error, would constitute a harmless one.

question allows an ALJ's justifiable reliance. *See Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994) (affirming reliance on complete hypothetical, vacated on other grounds); *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993) (affirming reliance on complete hypothetical).

As addressed above, the evidence in the record does not support any limitations on standing or walking for the RFC as determined up to the DLI, and thus the lack of such limitations in the RFC is supported by substantial evidence. Therefore, the lack of such limitations in the hypothetical posed to the VE was appropriate.

As for the right thumb triggering, Mr. Lukes does not point to any specific records as support for such an impairment and its ensuing limitations. Rather, the record shows that, while Dr. Cirrincione diagnosed right thumb flexor tenosynovitis in July 1999 (five months prior to alleged onset date) and prescribed an anti-inflammatory, with later cortisone injections in August and September, Mr. Lukes neither appeared for his follow-up appointment in October nor sought any other further treatment. R. at 137-39. Other than Mr. Lukes testimony of the thumb difficulty – and also his testimony that he continually worked through it – there is no record of thumb impairment. R. at 643-44. As all the references were prior to onset date and none showed interference with basic work activities, there is

substantial evidence to support the ALJ's refusal to include it
either as a severe impairment or in the RFC and following
hypothetical to the VE.

With regard to the need for excessive breaks, the VE
testified on the subject only because Mr. Lukes' attorney added
it to the ALJ's hypothetical. R. at 674-75. The ALJ reasonably
rejected the inclusion of excessive breaks in the RFC or the
hypothetical because there is no evidence in the record to
support its inclusion. The only mention of it was Mr. Lukes'
brief statement testifying that standing in one place for too
long would require him to sit and raise his feet. R. at 637.
However, there is no other evidence from the medical records, nor
from the opinion of the ME, and even Mr. Lukes has failed to
identify any specific as to what constitutes "too long." Nor did
Mr. Lukes point to any records in support of his argument.

Therefore, the evidence supports the ALJ's decision to
exclude the need for excessive breaks from the hypothetical posed
to the VE, and thus, his failure to acknowledge this limitation
was not an error.

**(7) RFC Function-by-function Assessment under SSR 96-8P**

Mr. Lukes argues that the ALJ failed to complete a function-
by-function assessment of capabilities, as required by Social
Security Ruling 96-8P. First, he challenges the discrepancy in
limiting use of hand and power tools without explanation as to

46

why that would not limit holding other objects of similar weight. Second, he challenges the effect of his visual impairment in the workplace, as the conclusion of seeing large objects but not small ones failed to take into account the distinction between central and peripheral vision.

The RFC analysis is essentially a "function-by-function" inquiry based on all the relevant evidence of a claimant's ability to do work and must identify the evidence that supports each conclusion. *Brown v. Barnhart*, 298 F. Supp. 2d 773, 798 (E.D.Wisc. 2004). The ALJ articulated his analysis of the record and of the ME's testimony, explaining that peripheral neuropathy would create difficulty in excessive fingering and feeling, but none with grasping. R. at 22. As discussed above, the precision required in using hand and power tools is completely in line with this analysis and explanation. Further, the ALJ referenced both the record and the ME's testimony that diabetic retinopathy would affect Mr. Lukes' ability to see small objects, based also in part on Mr. Lukes' own testimony that he suffered from blurry vision with fine print, but not to an extent to keep him from driving. R. at 22.

As such, the ALJ satisfied the burden of SSR 96-8P in his analysis of Mr. Lukes' RFC.

**(8)  *DOT* Janitor description and Grid Rule 202.02**

Mr. Lukes gives a one-sentence challenge to the VE's
testimony regarding the job description for janitor by summarily
stating that it conflicts with the *DOT* description.  He also
gives a one-sentence argument that, if assumed capable of the
full range of light work, he would still be disabled under Grid
Rule 202.02 because of his age and limited education.

An issue must be developed, rather than merely mentioned, to
be preserved in a court proceeding.  *Johnson v. Apfel*, 189 F.3d
561, 562 (7th Cir. 1999).  Mr. Lukes offers no specific *DOT*
description or other support for his first challenge here.  The
utter lack of development of this challenge offers no foothold
for analysis, and therefore, he has waived the argument.  Thus,
the ALJ's reliance on the VE's testimony regarding the janitorial
job is acceptable.

His reliance on Grid Rule 202.02 offers no development of
evidence supporting a restriction to light-level work and simply
assumes that this Court accepted his earlier arguments that Mr.
Lukes was not capable of the given RFC of medium work.  However,
as addressed above, the ALJ did base the RFC on substantial
evidence, and thus, this Court accepts the decision that Mr.
Lukes was capable of medium exertional work.  Therefore, the
specifications of Grid Rule 202.02 are not applicable.

48

*Conclusion*

For the above listed reasons, the Commissioner of Social Security's motion for summary judgment is granted and the Commissioner's decision by the ALJ is AFFIRMED.

Date: July 23, 2008          E N T E R E D:

Alander Keys

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT